UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH COLVIN, JR.,

        Plaintiff,

Case No. 1:13-cv-465

Hon. Robert J. Jonker

v.

KARL FOY, *et al.*,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner incarcerated by the Michigan Department of Corrections ("MDOC") pursuant to 42 U.S.C. § 1983. This matter is now before the court on a motion for summary judgment filed by defendant Karl Foy (docket no. 13).

**I.    Background**

The Court previously summarized plaintiff's allegations as follows:

Plaintiff Kenneth Colvin, Jr. presently is incarcerated at the Carson City Correctional Facility, though the actions about which he complains occurred while he was housed at the Ionia Maximum Correctional Facility (ICF). Plaintiff sues ICF Classification and Transfer Director Karl Foy and ICF Grievance Coordinator Myken D. Breedlove.

Plaintiff alleges that in 2011, shortly after he was released from administrative segregation, he wrote several letters to Defendant Foy, seeking a prison work assignment. On March 24, 2011, Foy responded, saying he had no work for Plaintiff at that time. On April 8, 2011, Plaintiff learned that Foy had assigned several prisoners work assignments, despite the fact that those prisoners had come from administrative segregation more recently than Plaintiff. Plaintiff filed a grievance against Foy. When he was reviewed on the grievance on April 19, 2011, Plaintiff complained to Lieutenant S. Cheeks that Defendant Foy was denying him a work assignment in retaliation for Plaintiff's having filed several grievances against Foy. Cheeks denied the grievance, telling Plaintiff that Defendant Foy had explained that he wanted to see Plaintiff misconduct-free for six months before

giving him a work assignment. Plaintiff completed a Step II appeal and mailed it to Defendant Breedlove.

On May 5, 2011, Plaintiff received a callout dated May 6, 2011, for a work assignment as a food-cart pusher. In that position, Plaintiff was made to work with Prisoner Williams, the prisoner with whom Plaintiff had had a fight on December 25, 2010, which had resulted in Plaintiff's administrative segregation. Plaintiff contends that he and Williams were likely to have another confrontation, but Plaintiff worked the job with Williams until May 22, 2011. Plaintiff claims that Foy made the assignment, despite knowing the history between the two prisoners and in violation of regular MDOC practice. Plaintiff filed a grievance, which was heard at Step I by Lt. Cheeks on May 22, 2011. Cheeks concluded that the work placement was not appropriate. Plaintiff contends that the work assignment was retaliatory and that Foy was deliberately indifferent to Plaintiff's safety.

On October 25, 2011, Defendant Foy ordered Plaintiff transferred to the Chippewa Correctional Facility (URF), a place Plaintiff claims is infamous for the physical and mental abuse of prisoners, particularly African-Americans and those who have filed grievances and lawsuits against MDOC employees. Plaintiff complains that Foy also failed to make a notation on Plaintiff's transfer order indicating that Plaintiff was currently receiving a Kosher diet. Plaintiff claims that failure to make the notation resulted in an unnecessary delay in Plaintiff's receiving a Kosher diet at URF. In addition, Plaintiff claims that the transfer was made just days before Plaintiff was eligible to receive a three-point reduction for working a job assignment for six months. Plaintiff alleges that the transfer was made in retaliation for Plaintiff's prior grievances against Foy.

Plaintiff next alleges that, during the entire period of his stay at ICF, he had a problem with the grievance process under Defendant Breedlove. Plaintiff filed a complaint against Breedlove on November 1, 2010, alleging that she had failed to carry out her duties by processing Step I grievances and failing to send Step II appeals. Plaintiff also raised the issue at the November Warden's Forum. On May 20, 2011, Plaintiff received correspondence from the Michigan Office of the Legislative Corrections Ombudsman, thanking Plaintiff for submitting his concerns and indicating that an investigation had been initiated to improve the grievance process statewide and that ICF had been contacted.

Plaintiff filed a grievance against Defendant Breedlove on June 19, 2011, and, on June 21, 2011, Plaintiff was placed on modified grievance access. [FN 1] Plaintiff complains that, while he was on modified access, Defendant Breedlove routinely ignored his requests for grievance forms, including his request for a form to grieve his placement on modified access. On June 7, 2011, in response to Plaintiff's request for numerous Step I and Step II grievances and appeals forms, Breedlove told Plaintiff to limit his requests for grievances to one per day. Plaintiff

2

alleges that, when he complained about Breedlove's handling of his grievances, Lt. Cheeks told Plaintiff that she suspected Breedlove was withholding grievances to anger Plaintiff. Plaintiff complains that Defendant Breedlove's interference with his grievances was done in retaliation for Plaintiff's prior grievances against Plaintiff.

Plaintiff seeks compensatory and punitive damages in the amount of $500,000.00.

> [FN 1 Under Michigan Department of Corrections policy, a prisoner is placed on modified access for filing "an excessive number of grievances which are frivolous, vague, duplicative, non-meritorious, raise non-grievable issues, or contain prohibited language. . .or [are] unfounded . . . ." MICH. DEP'T OF CORR., Policy Directive 03.02.130, ¶ HH. (eff. July 9, 2007). The modified access period is ninety days and may be extended an additional thirty days for each time the prisoner continues to file a prohibited type of grievance. *Id.* While on modified access, the prisoner only can obtain grievance forms through the Step I coordinator, who determines whether the issue is grievable and otherwise meets the criteria under the grievance policy. *Id.*, ¶ KK.

Opinion at pp. 2-4 (docket no. 5). The Court dismissed plaintiff's claims against defendant Breedlove but determined that plaintiff had made sufficient allegations to warrant service of the complaint on defendant Foy. *Id.* at p. 7.

## II.     Defendant's motion for summary judgment

### A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Plaintiff's retaliation claims

### 1. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 3 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

4

Plaintiff has alleged three instances of retaliation. First, plaintiff claims he was not given a work assignment immediately upon his release from administrative segregation. Second, plaintiff claims that he was placed in a work assignment with a prisoner with whom he previously had a fight. Third, plaintiff claims that he was transferred to a different facility in retaliation for filing grievances. To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith*, 250 F. 3d at 1037, *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (internal quotation marks omitted).

### 2. Plaintiff did not suffer any adverse actions

Defendant assumes that plaintiff was engaged in protected conduct, i.e., filing grievances against defendant. Defendant contends that plaintiff suffered no adverse action related to the third claim, and that plaintiff cannot establish causation as to any of the claims.

Based upon this record, however, the Court concludes that plaintiff has failed to demonstrate that he suffered an adverse action sufficient to support any of his retaliation claims. Examples of adverse actions that the Sixth Circuit has held sufficient to meet the "person of ordinary firmness" standard applicable to prisoners include "initiating a retaliatory transfer to another prison when it will result in foreseeable negative consequences to the prisoner, threatening to impose disciplinary sanctions, issuing major misconduct reports that could result in loss of disciplinary credits, and threatening the use of physical force." *Reynolds-Bey v. Harris*, 428 Fed. Appx. 493, 503 6th Cir. 2011) (internal citations omitted). Here, plaintiff's claim is based upon the assumption that his prison work assignment is analogous to employment, and that changes in his work assignment can be viewed as adverse actions upon which he can base a retaliation claim. This assumption is unwarranted.

Prisoners are not considered "employees" of the MDOC. *See* Policy Directive 05.02.110 ¶ A (eff. 2/25/08) ("Prisoners assigned to work are not employees of the Department and therefore are not eligible to receive workers' compensation or unemployment compensation benefits for their work assignments."). It is well established that a prisoner has no constitutional right to prison employment or to a particular prison job. *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989); *Dobbins v. Craycraft*, 423 Fed. Appx. 550, 552 (6th Cir. 2011). Nor does a prisoner have a right to employment under Michigan law, which gives prison administrators complete discretion regarding prisoner work assignments. *Dobbins*, 423 Fed. Appx. at 552. *See* Policy Directive 05.01.100 ¶ O (eff. 5/30/11) ("[a]ll employable prisoners shall be classified to a work assignment unless assigned to school"). Courts consider prison work assignments to be a condition of confinement. *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993) ("[p]rison work assignments

are conditions of confinement subject to scrutiny under the Eighth Amendment"); *Jones v. Michigan*, 698 F. Supp. 2d 905, 915 (E.D. Mich. 2010) (same); *Terrill v. Bertussi*, No. 2:05-cv-96, 2005 WL 3277990 at *3-*5 (W.D. Mich. Dec. 2, 2005) (same); *Lee v. Sikes*, 870 F. Supp. 1096, 1099-1101 (S.D. Ga. 1994) (same). Eighth Amendment claims arising from prison work assignments are typically limited to extreme working conditions which a prisoner claims to be cruel and unusual punishment. *See, e.g., Jones v. Campbell*, 25 Fed. Appx. 287, 288 (6th Cir. 2001) (rejecting prisoner plaintiff's Eighth Amendment claim for injuries suffered while working at a recycling center because defendants were at most negligent for creating the dangerous work conditions, and a prisoner "cannot base an Eighth Amendment claim on mere negligence"); *Howard v. King*, 707 F.2d 215, 219-20 (5th Cir. 1983) ( inmates would be entitled to relief based upon allegations that their 56 hour, 7-day work week engaged in field labor caused perpetual exhaustion and physical breakdown).

In addition, prisoners are expected to endure more than the average citizen. *Siggers-El v. Barlow*, 412 F.3d 693, 701-02 (6th Cir. 2005). While the "average citizen" might have certain expectations from being a contract or at-will employee, and relies upon his or her employment to provide for the necessities of life, prisoners, such as plaintiff, do not have a similar expectations or reliance with a prison work assignment. As discussed, prisoners with work assignments are not employees of the MDOC. In addition, unlike the average citizen, plaintiff is in the custody of the state, which provides him housing, food, clothing and medical care. *See* Policy Directive 03.03.130 ¶ A ("Each prisoner shall be assigned to a housing unit upon arrival at a correctional facility"); Policy Directive 04.07.100 ¶ F ("At least three meals shall be served to offenders at the facility at regular meal times during each 24-hour period with no more than 14 hours between the evening

7

meal and breakfast, except during an emergency when it is not possible to serve a meal. However, on weekends and holidays, only two meals may be served during each 24-hour period (e.g., 'brunch' and evening meal) with approval of the Warden[.]"); Policy Directive 04.07.110 Policy Statement ("Prisoners . . . shall be provided state-issued items, including clothing, and provided cell/room furnishings to provide for their basic needs while incarcerated"); Policy Directive 03.04.100 ¶ E ("All prisoners. . . shall have access to health services as described in this policy, regardless of custody level or security classification. A prisoner whose health care needs cannot be met at the facility where the prisoner is housed shall be transferred to a facility where those needs can be met. . .").

In *Siggers-El*, 412 F.3d at 701-04, the Sixth Circuit briefly addressed how prison work assignments fit within the context of an alleged retaliatory transfer. The Court observed that the transfer of a prisoner to a different facility could be an adverse action sufficient to support a retaliation claim where the foreseeable consequences from that transfer inhibited the prisoner's ability to access the courts. *Id.* In *Siggers-El*, the prisoner had agreed to pay an attorney $300.00 to review an appellate brief related to a criminal conviction. *Id.* at 697. Under these circumstances, the foreseeable consequences of his particular transfer included the loss of "his high paying job" needed to pay the attorney coupled with the fact that his transfer to a different facility "made it more difficult for his attorney to visit with or represent him because he was moved further away from [his attorney]." *Id.* at 697, 702. The Sixth Circuit found the loss of the prison work assignment significant because plaintiff had demonstrated that the loss of the income from the assignment could adversely affect his ability to access the court in a pending appeal. *See id.* at 702 ("In this case, however, the transfer would deter a person of ordinary firmness from engaging in protected conduct,

8

since here, the [Plaintiff] was not only transferred, but also suffered a number of foreseeable consequences that inhibited the Plaintiff's ability to access the courts."). Here, however, plaintiff has failed to demonstrate that the foreseeable consequences from the changes in his prison work assignment interfered with his ability to access the court.

Defendant's failure to give plaintiff a work assignment immediately upon his release from administrative segregation and defendant's later placement of plaintiff in a work assignment with a prisoner with whom plaintiff had a previous fight were not adverse actions for purposes of establishing a retaliation claim. *See Jewell v. Leroux*, 20 Fed. Appx. 375, 377 (6th Cir. 2001) (finding no adverse action where the plaintiff prisoner alleged that he had been wrongfully removed from a prison job and transferred to another prison in retaliation for filing grievances); *Cohron v. City of Louisville*, No. 3:06cv-P570-C, 2010 WL 1049975 at *3 (W.D. Ky. March 19, 2010 (plaintiff inmate's removal from the work list did not constitute an adverse action for purposes of a retaliation claim).

Finally, plaintiff's transfer to another correctional facility, in and of itself, is not an adverse action. "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El*, 412 F.3d at 701-02. *See Jewell*, 20 Fed. Appx. at 378 ("A transfer to the general population of another prison is not considered sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights."). *Cf. Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)("an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State"); *Meachum v. Fano*, 427 U.S. 215, 228 (1976) ("[w]hatever expectation the prisoner may have in

9

remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all").

Here, plaintiff has not demonstrated that he would suffer any adverse foreseeable consequences due to the transfer. Plaintiff's only allegation is that the transfer order prepared by defendant did not include a reference to placing him on the Kosher meal program. This alleged omission is not sufficient to establish a retaliatory transfer. Defendant points out that the policy directive addressing transfer orders, MDOC Policy Directive 05.01.140 ("Prisoner Placement and Transfer") does not require the transfer order to include this type of dietary information, that approval for religious meals occurs at the central office level, and that this information can be verified by staff at the new correctional facility. *See* Policy Directive 05.01.140; MDOC Policy Directive 05.03.150 ¶ SS ("[a] prisoner may eat from a religious menu only with approval of the CFA Special Activities Coordinator"). Based on this record, plaintiff has failed to demonstrate that there were foreseeable consequences to his transfer which were so adverse and exceptional as to transform a routine transfer into a retaliatory action.

Accordingly, defendant's motion for summary judgment should be granted as to all retaliation claims.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendant's motion for summary judgment (docket no. 13) be **GRANTED** and that this action be **DISMISSED**.


Dated:  February 10, 2014                              /s/ Hugh W. Brenneman, Jr.
                                                      HUGH W. BRENNEMAN, JR.
                                                      United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).